under authority of law, and inasmuch as that officer is empowered to decide upon the merits of the application, his decision in granting the patent is presumed to be correct." Agawam Woolen Co. v. Jordan, 7 Wall. 583, 597, 19 L. Ed. 177.

In support of this general proposition, these authorities may also be cited: Mitchell v. Tilghman, 19 Wall. 287, 391, 22 L. Ed. 125; Chase v. Fillebrown (C. C.) 58 F. 374; Consol. Contract Co. v. Hassam Pav. Co. (C. C. A.) 227 F. 436; Schumacher v. Buttonlath Mfg. Co. (C. C. A.) 292 F. 522, 531; Christensen v. Noyes, 15 App. D. C. 94, 111.

█ In our opinion, the Board of Appeals arrived at a correct conclusion in holding that to grant appellant's application would amount to double patenting. In view of this conclusion, a determination of the applicability of the reference patents Putnam, Wiener, Cozakos, Waters, and Jeffery, is not necessary, and this decision is in no part based thereon.

The decision of the Board of Appeals is affirmed.

Affirmed.

BLAND, Associate Judge (specially concurring).

I concur in the conclusion reached solely upon the grounds: First. That we cannot pass upon the invalidity of a patent. Second. If the design patent is to be regarded as valid, the patentee might find himself in a position where he could not make tires in accordance with his design.

I agree that the following portion of the court's opinion is supported by the great weight of authority:

" * * * This principle is well stated by the Examiner in the following language:

" 'If the feature in which the novel esthetic effect resides is the identical feature which produces the novel function, so that a structure embodying the mechanical invention would, of necessity, embody the design, and vice versa, it is questionable whether two separate patents, one for a design, the other for a mechanical patent, should issue; for neither patent could be practiced without infringing the other.'

"When the two ideas are indistinguishable in their characteristics, and manifestly the result of the same inventive idea, a second patent will not be granted. Williams Calk Co. v. Neverslip Mfg. Co. (C. C.) 136 F. 210, affirmed in Williams Calk Co. v. Kemmerer (C. C. A.) 145 F. 928."

In White Co. v. Converse & Son Co. (C. C. A.) 20 F.(2d) 311, cited in the majority opinion, the inventive idea of the design of the "Kiddie Kar" was the exact inventive idea of the mechanical patent of the same. There the "Kiddie Kar" was not ornamented, but the design represented the complete structure of the mechanical "Kiddie Kar" invention.

In the case at bar the inventive idea of the design inventor of an ornamentation of a tire was not the same inventive idea as in the mechanical invention, and especially is this true when certain of appellant's claims, which do not describe the design, are considered. Designs must be viewed as a whole. Therefore the above-quoted rule, irrespective of its correctness where applicable, does not apply here. Appellant might build a tire in accordance with certain of his claims without infringing the design patent, but the design inventor could not apply his design to a tire without infringing all the claims in the mechanical application.

If the design inventor could not use his design without infringing the mechanical patent claims, I think that the design patent (assuming it to be valid), is a proper reference upon which to reject the mechanical patent even if it cannot be said that "the two ideas are indistinguishable in their characteristics, and manifestly the result of the same inventive idea.".

In re CROSS.*

Patent Appeal No. 2808.

Court of Customs and Patent Appeals.

Dec. 17, 1931.

Thomas E. Scofield, of Kansas City, Mo. (Henry H. Snelling, of Washington, D. C., of counsel), for appellant.

*Rehearing denied February 1, 1932.

T. A. Hostetler, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

The appellant filed application in the United States Patent Office for a patent upon alleged improvements in "Oil Well Drilling Methods." All the claims, 13 to 25, inclusive, were rejected by the Examiner and by the Board of Appeals, upon the following references: McCulloch, 1,286,043, November 26, 1918; Olsson, 1,442,413, January 16, 1923; Carman, 1,460,788, July 3, 1923; Lake et al., 1,498,045, June 17, 1924; Kraus, 1,509,406, September 23, 1924; Stroud, 1,575,944, March 9, 1926; Stroud, 1,575,945, March 9, 1926; Taylor, "The Chemistry of Colloids", pages 5 and 6, London, Edward Arnold, 1920; Searle, "The Chemistry & Physics of Clays," Ernest Benn Ltd., London, 1924, pages 246 to 249, articles entitled "Deflocculation" and "Protection of Clay Suspension"; Ibidem, page 271, article, "Increasing Plasticity"; and Ibidem, page 272, article "Reducing Plasticity"; Technical paper No. 438, Bureau of Mines, Government Printing Office, 1928, "Bentonite, Its Properties, Mining, Preparation and Utilization," page 10, table 1, page 11, article of Davis from Ind. and Eng. Chem., Vol. 19, 1927, p. 1350; California Oil Fields, January 1923, Vol. 8, No. 7, California State Mining Bureau, page 63, last six lines.

Claims 13 to 17, inclusive, and 22, are process, and the balance are product, claims. It is thought claims 14, 18, and 20 are fairly illustrative. These are as follows:

"Claim 14. The process of increasing the efficiency of a drilling operation employing a mud-laden fluid which consists in adding to the fluid a gel-forming colloidal clay such as bentonite."

"Claim 18. A mud-laden oil well circulating fluid including a gel of bentonite."

"Claim 20. An oil well fluid including a gel of bentonite carrying in suspension a heavy metal bearing mineral such as hematite, galena, barytes, etc."

Appellant's alleged invention consists in the use of a mud in rotary deep well drilling operations, as a circulating fluid, which mud contains a colloidal suspension of bentonite, and which may also carry in solution certain heavy materials, to give greater specific gravity to the circulating fluid. In drilling, this fluid is forced down through the drill pipe and drill, and then returns to the surface outside the drill pipe, carrying the cuttings from the drill. On reaching the surface, it is discharged into a settling basin, where the drill cuttings settle to the bottom, after which the fluid is drawn off and used again. It performs, in addition to carrying off the cuttings, several other useful functions. It lubricates and cools the drill, by its pressure tends to keep back gas encountered in drilling, plasters the walls of the hole and prevents caving, and helps to prevent friction and abrasion.

If there is any invention in the application of appellant, it consists in one or more of the following ideas: First, to add to a well drilling mud a colloidal material which will remain in suspension indefinitely and will not settle or precipitate out of the mud; second, to use bentonite for such purposes; third, to add weight increasing elements to such colloidal suspension, such as hematite, galena, etc., or to add Portland cement.

In view of the references, we are unable to discover any novelty in any of these ideas. The reference Stroud, No. 1,575,945, a patent issued on March 9, 1926, discloses very fully in its specification the necessity and desirability of using a well drilling mud which is "a true suspensoid," which will be slimy instead of abrasive, which will penetrate the wall of the well hole and build up a noneroding well, which will lubricate, which will readily drop the well cuttings, and will have sufficient weight to resist gas pressures. To one skilled in the art of well drilling with the use of fluid mud, the specification and claims of Stroud would at once suggest the desirable properties to be added to such mud.

However, it is argued that Stroud suggested the addition of a substance, barytes barium sulphate, which, it is said, will not form a colloidal suspension. Admitting, for the present, this proposition to be correct, how does the matter stand?

If the party skilled in the art attempted to practice the art as disclosed by Stroud, and found barytes barium sulphate would not give him the colloidal suspension necessary, he would be fully advised by the publications and teachings of the prior art that bentonite might be used as such a colloid to obtain the properties taught to be necessary by Stroud. In the reference Technical Paper No. 438, Bureau of Mines, 1928, which

refers to an article by C. W. Davis on "The Swelling of Bentonite and Its Control," Ind. and Eng. Chem. Vol. 19, 1927, p. 1350, all the useful properties of bentonite as a colloid claimed in this application are discussed at length. The Davis article above referred to, discusses the properties of bentonite encountered in oil well drilling.

It seems quite obvious, therefore, that at the time appellant filed his application, his conception of the use of a colloidal suspension in oil drilling mud, and of the use of bentonite as such colloid, did not constitute invention in view of the prior art.

The addition of loading or weight making agents, or Portland cement, was disclosed, as we view it, by the references Stroud, 1,575,944 and 1,575,945, Carman, and California Oil Fields, January, 1923, Vol. 8, No. 7.

We have not found it necessary to discuss the remaining references or their applicability.

The decision of the Board of Appeals is affirmed.

Affirmed.

## ILLINOIS TERMINAL CO. v. UNITED STATES.

### No. M–75.

Court of Claims.
Dec. 7, 1931.

Chester A. Gwinn, of Washington, D. C. (Humphreys & Gwinn, of Washington, D. C., on the brief), for plaintiff.

Charles B. Rugg, Asst. Atty. Gen. (Joseph H. Sheppard, of Washington, D. C., on the brief), for defendant.

Before BOOTH, Chief Justice, and LITTLETON, WHALEY, WILLIAMS, and GREEN, Judges.

LITTLETON, Judge.

The plaintiff is a railroad corporation which was under federal control from January 1, 1918, to February 29, 1920. It did not enter into a so-called "standard agreement" with the Railroad Administration for the federal control period. Final settlement with the United States Railroad Administration was effected September 21, 1922, resulting in the payment to plaintiff of a balance of $50,000. In this final settlement compensation for the use of plaintiff's properties for the period of federal control was determined at the rate of $350,000 a year. The Interstate Commerce Commission, on June 7, 1923, certified to the President that $390,818.05 represented the so-called "standard agreement." Plaintiff received from the government $390,818.05, representing the "standard return," for the use of its properties under federal control, and included this sum in its tax return for 1922, and paid the total tax shown by the return in quarterly installments on March 14, June 13, September 15, and December 15, 1923. The Commissioner of Internal Revenue determined and held that the said sum of $390,818.05 accrued and was income for the calendar years 1918, 1919, and 1920. Plaintiff instituted a proceeding before the United States Board of Tax Appeals testing the correctness of the Commissioner's determination for the three years mentioned, in so far as it held that the amount of $390,818.05 was income for those years instead of 1922. The determination of the Commissioner was upheld by the Board of Tax Appeals, which resulted in deficiency assessments for 1918, 1919, and 1920, which assessments were thereafter duly paid. On November 24, 1926, plaintiff filed a claim for refund for the calendar year 1922, setting forth as specific grounds therefor the erroneous inclusion in taxable income for that year of the said sum of $390,818.05, as "standard return." April 15, 1927, the Commissioner of Internal Revenue notified the plaintiff of his final determination for 1922, which determination excluded from taxable income the item of $390,818.05, being the amount of the "standard re-